UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| ROBERT O. CARR AND KATHERINE M. HANRATTY, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against defendants Robert O. Carr ("Carr") and Katherine M. Hanratty ("Hanratty").

## SUMMARY

1.      This case involves insider trading by Carr, a New Hampshire resident, and Hanratty, a Connecticut resident, in the shares of Heartland Payment Systems, Inc. ("Heartland"), a New Jersey-based company, ahead of its December 15, 2016 announcement that it was to be acquired by Georgia-based Global Payments, Inc. ("Global").  Carr, then the Chief Executive Officer ("CEO") of Heartland, tipped Hanratty, his romantic partner, to material, nonpublic information that was expected to – and did – dramatically increase the value of Heartland's stock.  Specifically, Carr tipped Hanratty concerning the acquisition of Heartland by Global, and Hanratty purchased Heartland stock while in possession of, and on the basis of, that material, nonpublic information provided by Carr.

2.      Carr, as the CEO of Heartland, was intimately involved in the negotiations from October to December 2015 that led to his company's acquisition by Global.  Carr shared material, nonpublic information about the potential acquisition of Heartland by Global with Hanratty at various times during this period.  For example, on or before November 9, 2015, Carr

revealed to Hanratty that he would be meeting with the CEO of Global on November 9, 2015, to discuss the potential acquisition of Heartland by Global.  That same day, after Carr's meeting with the Global CEO had concluded, Carr sent an email to Hanratty and told her on that Global had offered to acquire Heartland for a premium per share of Heartland's stock, and told Hanratty that the acquisition of Heartland would be completed by mid-December 2015.  Thereafter, on November 15, 2016, Carr provided Hanratty a check for $1 million and instructed her to use that money to open a brokerage account and purchase $900,000 worth of Heartland stock.  Hanratty acquired the Heartland securities as instructed by Carr, completing the purchases of Heartland stock weeks prior to the news of the acquisition of Heartland by Global became public in December 2015.   The acquisition of Heartland by Global caused Heartland's stock price to significantly increase, and Hanratty eventually sold the stock for a profit of over $250,000.

3.     By knowingly or recklessly engaging in the conduct described in this Complaint, Carr and Hanratty violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

4.     The Commission brings this action pursuant to Section 21(d) of the Securities Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks a permanent injunction against the defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of ill-gotten gains, derived from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest; and a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and the Insider Trading and Securities Fraud Enforcement Act of 1988.  In addition, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

2

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to Exchange Act Sections

21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.      Venue lies in this Court pursuant to Exchange Act Sections 21(d), 21A, and 27

[15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  Hanratty resides and works in the District of

Connecticut, and many of the acts, practices, transactions, and courses of business alleged in this

Complaint occurred within the district.

## DEFENDANTS

7.      **Katherine M. Hanratty**, age 65, is a resident of Watertown, Connecticut.

Hanratty co-owns a Connecticut-based staffing agency.  Hanratty has been romantically involved

with Carr since approximately 2011.

8.      **Robert O. Carr**, age 73, is a resident of New London, New Hampshire.  Carr

founded Heartland in 1996 and was its CEO until the company's acquisition by Global in April

2016.  Carr has been Hanratty's romantic partner since approximately 2011.

## RELEVANT ENTITY

9.      **Heartland Payment Systems, Inc.** was a Delaware company with a principal

place of business in Princeton, New Jersey.  It was in the business of payment processing.

Heartland became an SEC-reporting company in 2005.  On December 15, 2015, Global, a

Georgia-based payment technology company with a principal place of business in Atlanta,

Georgia, announced that it would acquire Heartland for approximately $4.3 billion.  Global has

been an SEC-reporting company since 2001 and Global completed its acquisition of Heartland

on April 25, 2016.

**STATEMENT OF FACTS**

   **A.**  **Carr/Hanratty Relationship**

      10.     In 2011 Carr and Hanratty began a romantic relationship.  Carr and Hanratty communicated frequently.  They often traveled together, visiting family and friends.  Hanratty also occasionally accompanied Carr on business trips and he routinely confided to her regarding his work.  Hanratty was also in frequent communication with Carr's family and friends.

      11.     Over time, Hanratty repeatedly expressed concern to Carr regarding her financial security.  In March of 2015, while on vacation together in Mexico, Carr offered to give Hanratty some money for her financial security.  Hanratty rejected Carr's offer at the time, but it remained a topic of conversation between them at least through the end of 2015.

   **B.**  **Carr Provided Hanratty with Material Nonpublic Information, which Hanratty Uses to Purchase Heartland Shares.**

      12.     On or about October 15, 2015, while attending a conference, the CEO of Global approached Carr to request a meeting to discuss Global's potential acquisition of Heartland.

      13.     On or about November 9, 2015, Carr and Global's CEO met in person in Atlanta, Georgia, to discuss the possibility of a strategic combination between Heartland and Global.  On the morning of November 9, 2015, Hanratty emailed Carr stating: "Have a good meeting with Global!"

      14.     Later on November 9, 2015, Carr emailed Hanratty regarding the progress of the negotiations, stating that the meeting with the Global CEO had been "good" and that the offer price was $97.50 per share of Heartland stock, a premium to the then current trading price.  In the email Carr also informed Hanratty that he thought the proposed acquisition of Heartland would close in mid-December 2015.  She replied in a return email: "Wow quite an offer."

15.     On November 10, 2015, at a regularly scheduled Heartland board of directors meeting, Carr informed the board of the discussions with the Global CEO regarding a merger and received authorization to continue the discussions.

16.     Subsequently, during the afternoon of November 10, 2015, Carr discussed with Heartland's investment advisors a potential script for a phone call with Global's CEO, planned for at 9:30 am on November 11, 2015.  Among the topics identified in the script were the following: 1) Heartland board's interest in Global potentially acquiring Heartland; 2) the need that the offer would have to be in the $100 per share range (a 30% premium over the current price per share of Heartland stock); and 3) time and certainty was a necessity so Heartland wanted a deal before Christmas.

17.     Later that day Hanratty emailed Carr hoping that the board of directors meeting was "good."  Carr responded via email that the board of directors meeting had been good. Hanratty in turn responded via email that she was "[g]lad it went well."

18.     On November 11, 2015, Carr spoke by telephone with Global's CEO.  After the phone call, Global's CEO emailed Carr indicating that he had spoken to Global's Chairman of the Board and wanted to meet on Friday, November 20, 2015 in Toronto, Canada to continue discussions.  Global's CEO informed Carr that he was bringing Global's Chief Financial Officer ("CFO") and President to the meeting.  Finally, Global's CEO requested that Carr bring Heartland's CFO and its President of the Strategic Markets Group.

19.     By November 13, 2015, in preparation for the planned November 20, 2015, meeting with Global, Heartland's investment banking firm had provided an analysis to Carr to determine the implications of a potential acquisition of Heartland by Global, including its effects on Global going forward.

20.     On or about November 15, 2015, Carr provided Hanratty with a check drawn from his personal checking account dated November 16, 2015 for $1 million.  Carr wrote "loan" in the memo section of the check.

21.     Later on November 15, 2015, Hanratty emailed herself a to-do list that included "HPY," the stock ticker symbol for Heartland, and conducted internet searches on how to buy stock.

22.     On November 17, 2015, Hanratty went to her local bank branch and deposited the $1 million check into her checking account.  During that visit she inquired of the bank manager as to how to open a brokerage account.

23.     On November 17, 2015, Hanratty emailed Carr and stated that she had made arrangements to "purchase the HPY [Heartland] stock as soon as the out of state check clears." In her email she also informed Carr that "I am following your advice to the letter and keeping the amount you suggested in a saving [sic] account for now."

24.     On November 18, 2015, Hanratty opened a brokerage account with a broker-dealer firm that she was referred to by her local bank and then wrote a check to the brokerage firm for $900,000 to fund the account.  She stated in her brokerage account opening paperwork that she owned no securities as of the opening of the brokerage account.  In her brokerage account opening paperwork, Hanratty also stated that the source of her funds was a "gift" and she listed Carr as the beneficiary of the brokerage account upon her death.  In fact, while in the midst of opening her brokerage account, Hanratty emailed Carr requesting his social security number to allow her to name him as a beneficiary.

25.     In communications with her broker while opening the brokerage account, Hanratty stated that she felt obligated to purchase Heartland stock because she received the gifted money from the owner of the company.

26.      Later on November 18, 2015, Hanratty emailed Carr that she had become a shareholder of Heartland.  In a reply email, Carr thanked Hanratty for the purchase.  In her subsequent email reply to Carr, Hanratty informed Carr that she had purchased 8,500 shares of Heartland stock and intended to obtain additional shares the next day.

27.     On November 18, 2015, Hanratty purchased 8,500 shares of Heartland stock at $78.84 per share.  On November 19, 2015, she bought an additional 2,500 shares at $78.88 per share.  Finally on November 23, 2015, she purchased an additional 393 shares for $79.49 per share.  In total, between November 18, 2015, and November 23, 2015, Hanratty purchased 11,393 shares of Heartland stock for $899,852 for an average cost of $78.98 per share.

28.     In the midst of Hanratty's purchases of Heartland shares, on November 19, 2015, after a conversation between Carr and the Global CEO, the two companies entered into a mutual confidentiality agreement – an agreement by the companies to keep information confidential during Global's due diligence of Heartland's financial condition prior to an acquisition.

29.     On November 20, 2015 the Heartland and Global management teams met so that Global could start its due diligence investigation, a common business practice that, in this situation, would involve one company taking steps to research and analyze another company it is considering acquiring.

30.     On November 21, 2015, during a trip to Chicago for Carr's 70th birthday party with Hanratty and members of Carr's family, Carr announced to his children and their spouses that an Atlanta-based company named Global had offered to buy Heartland and that he would

not sell Heartland to Global unless the offer had a "1" in the price, implying that he wanted at least $100 per share.

31.     On November 23, 2015, Hanratty emailed Carr to express her gratitude and stated "for the first time ever I feel a sense of relief knowing that I have some security."  Referring to the $1 million, Hanratty repeated that "I have done exactly what you recommended I do with it and made you the beneficiary of the account."  Carr replied via email that he was glad that she was not so stressed anymore.

32.     On November 24, 2015, Global sent a preliminary letter proposal to Heartland offering $97.50 per share to acquire Heartland, the same price in Carr's email to Hanratty two-weeks earlier.

33.     Negotiations between Heartland and Global continued and on December 10, 2015, multiple news organizations publicly reported that the two companies were negotiating an acquisition and that a deal was likely.

34.     On that day, after the news reports, Heartland's stock price increased by $6.95 per share (8.93%) to close at $84.79 per share.  Although the news reports did not reveal any pricing or deal terms, Heartland and Global nevertheless decided to accelerate the acquisition discussions as a result of the reports.

35.     Between December 12 and December 14, 2015, Hanratty repeatedly emailed Carr about his "crazy busy" preparations at Heartland.  On December 13, Carr emailed Hanratty his draft quote to be used for the press release of the pending acquisition.  Just minutes later, she replied "love it" and provided a suggestion for the draft quote.

36.     On December 15, 2015, after the close of trading of the securities markets, Heartland and Global announced that they had entered into a merger agreement whereby Global

would acquire Heartland in a cash-and-stock transaction for $100.00 per share. The public announcement prompted Heartland's stock price to increase by $9.87 (11%) per share to a price of $94.97 per share by the close of markets the next day.

37.     Hanratty held on to her Heartland stock and on January 28, 2016, she emailed her broker stating that Carr had decided to resign from Heartland and she planned to sell her stock.

38.     On April 11, 2016, Hanratty emailed Carr asking for his guidance on when she should sell the Heartland stock. The very next day, Carr emailed Hanratty that he saw "no reason at all" why she should not sell that day as the stock had risen to $101.37 per share. Hanratty then emailed Carr that she would sell all of her Heartland stock that day.

39.     The next day, Hanratty emailed Carr again, stating that she sold her stock according to Carr's instructions. Hanratty sold her 11,393 shares of Heartland at $101.066 per share, for a profit of $250,628 when compared to the prices at which she bought the stock in November 2015.

## C. Carr Violated His Duty to Heartland by Tipping Hanratty as to Material, Nonpublic Information.

40.     Heartland's Code of Ethics and Business Conduct ("the Code") explicitly prohibited all employees from trading in securities or other types of property based on knowledge derived from their employment. The Code stated that "[i]t is also illegal to give tips to others which [sic] allow them to trade securities and property using such 'insider information.'" We follow these laws strictly and without exception." Finally, the Code required Carr to read carefully "Heartland's Policy Regarding Trading in Company Securities" ("Insider Trading Policy").

41.     The Insider Trading Policy specifically stated that no officer "who is aware of material nonpublic information relating to [Heartland] may (a) buy or sell securities of the

Company …or engage in any other action to take personal advantage of that information, or (b) pass that information on to others outside the Company including family, friends, and acquaintances."

42.     The Insider Trading policy provided detailed examples of material nonpublic information including "[a] pending or proposed merger, acquisition, tender offer or other corporate consolidation or restructuring transaction."  Further, the policy warned that the Commission has successfully prosecuted cases against employees "trading by family members and friends."

43.     Carr, as the CEO of Heartland, was subject to its insider trading policy.  On information and belief, Carr was required to certify in writing that he had read and complied with the policy on a regular basis.

44.     Information regarding Global's potential acquisition of Heartland, which Carr obtained as a result of his employment as CEO of Heartland, was not publicly disseminated prior to December 10, 2015 news reports.  In fact, both Heartland and Global had mutually agreed to keep the information strictly confidential.

45.     The information regarding the potential acquisition of Heartland by Global was material.  A reasonable investor would have viewed this information as being important to his or her investment decision or a significant alteration of the total mix of information made available to the public about Heartland's stock.

46.     By providing Hanratty the material, nonpublic information about the potential acquisition of Heartland and the funding to trade Heartland's stock, Carr violated the company's Code, which "strictly" prohibited giving "tips to others which allow them to trade securities and

property using … 'insider information.'" More generally, Carr breached his duty to the shareholders of Heartland.

47.     Carr knew or recklessly disregarded that tipping Hanratty was in breach of a fiduciary duty he owed to Heartland and its shareholders.

## CLAIMS FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

48.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 47 above.

49.     The information described in the Complaint was material and nonpublic and was considered by Heartland to be confidential.  Heartland had policies and procedures protecting confidential information.

50.     Carr learned of the material nonpublic information described in the Complaint during the course of his employment as CEO of Heartland and had an obligation to protect the confidentiality of that information, as well as a fiduciary duty not to misuse such information for personal gain to himself or others.

51.     Carr tipped Hanratty to trade in the stock of Heartland based on the material nonpublic information in exchange for a direct or indirect personal benefit.

52.     Hanratty knew or should have known that Carr breached his duty to Heartland and its shareholders when she traded in the stock of Heartland while in the possession of material nonpublic information.

53.     As alleged herein, Carr and Hanratty directly or indirectly, singly or in concert, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, intentionally, knowingly or recklessly:  (a) employed or

11

are employing devices, schemes or artifices to defraud; (b) made or are making untrue statements of material fact or omitted or is omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon other persons.

54.     By reason of the foregoing, Carr and Hanratty have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.     Permanently restraining and enjoining Carr and Hanratty from violating Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

B.     Ordering Carr and Hanratty to disgorge with pre-judgment interest, all illicit trading profits and all other ill-gotten gains received as a result of the conduct alleged in this Complaint;

C.     Enter an order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Carr from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [ 15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

D.     Ordering Carr and Hanratty to pay a civil monetary penalty pursuant to Exchange Act Section 21A [15 U.S.C.§ 78u-1 ];

E.     Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

By its attorneys,

/s/ Deena R. Bernstein
Deena R. Bernstein (Mass. Bar. No. 558721,
    CT phv-02906)
    Senior Trial Counsel
Angela Lin
    Senior Counsel
**SECURITIES AND EXCHANGE
COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8813 (Bernstein direct)
Facsimile:   (617) 573-4590
BernsteinD@sec.gov (Bernstein email)

Local Counsel:

/s/ John B. Hughes
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373 (Facsimile)