**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | 3:18 Civ. 1135 (SRU) |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ROBERT O. CARR and KATHERINE M. | ) | |
| HANRATTY, | ) | |
| Defendants. | ) | |
| | ) | OCTOBER 10, 2018 |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ROBERT O. CARR'S
MOTION TO DISMISS THE COMPLAINT**

**ORAL ARGUMENT REQUESTED**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ...................................................................................................... 8

    I.   APPLICABLE LAW ................................................................................ 8

        A.  "Insider Trading" Claims Must Be Plausible and Pleaded with Particularity ............. 8

        B.  Requirements to State a Claim for Tipper Liability under Section 10(b).................... 9

    II.  THE SEC FAILS TO STATE A CLAIM AGAINST MR. CARR FOR TIPPER LIABILITY UNDER SECTION 10(B) AND RULE 10B-5 .......................................... 11

        A.  As to the November 9 Email Exchange, the Complaint Fails to Allege that, at the Moment of Tipping, Mr. Carr Had Reason to Expect that Ms. Hanratty Would Subsequently Trade on that Information.......................................................... 11

        B.  The SEC Fails to Allege Any Other Tips with Particularity, Much Less Plausibility ............................................................................................... 14

CONCLUSION.................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... *passim*

*In re Cardiac Devices Qui Tam Litig.*,
221 F.R.D. 318 (D. Conn. 2004) .................................................................................8

*Catapano-Fox v. City of New York*,
No. 14 Civ. 8036(KPF), 2015 WL 3630725 (S.D.N.Y. June 11, 2015) ...................................4

*Coyne v. Gen. Elec. Co.*,
No. 08-cv-1135 (SRU), 2010 WL 2836730 (D. Conn. July 15, 2010) ...............................4, 5

*Dirks v. SEC*,
463 U.S. 646 (1983) ......................................................................................10, 17

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ...................................................................................................9

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) .................................................................................14

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ..........................................................................................3

*In re Merrill Lynch & Co., Inc.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003) ............................................................3, 4, 5

*Salman v. United States*,
137 S. Ct. 420 (2016) .................................................................................................12

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977) .................................................................................................17

*SEC v. Obus*,
693 F.3d 276 (2d Cir. 2012) .......................................................................... *passim*

*SEC v. One or More Unknown Traders in Secs. of Onyx Pharms., Inc.*,
296 F.R.D. 241 (S.D.N.Y. 2013) ....................................................8, 9, 12, 15

*SEC v. Rocklage*,
470 F.3d 1 (1st Cir. 2006) .................................................................................9

*SEC v. Switzer*,
590 F. Supp. 756 (W.D. Okla. 1984) .................................................................12

*SEC v. Yun*,
    327 F.3d 1263 (11th Cir. 2003) .................................................................................9

*United States v. Corbin*,
    729 F. Supp. 2d 607 (S.D.N.Y. 2010) ......................................................................9

*United States v. Falcone*,
    257 F.3d 226 (2d Cir. 2001) ...................................................................................10

*United States v. Gansman*,
    657 F.3d 85 (2d Cir. 2011) ...............................................................................10, 12

*United States v. Martoma*,
    894 F.3d 64 (2d Cir. 2018) .......................................................................10, 13, 14

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014) ..................................................................................14

**Statutes**

15 U.S.C. § 78j(b) ...........................................................................................................9, 17

**Other Authorities**

17 C.F.R. § 240.10b-5......................................................................................................9, 17

Federal Rule of Evidence 201(b)(2) .....................................................................................3

Federal Rule of Civil Procedure 8 ......................................................................................15

Federal Rule of Civil Procedure 9(b)......................................................................8, 11, 12, 15

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................15

## INTRODUCTION

An insider trading claim under Section 10(b) of the Exchange Act and Rule 10b-5 can create liability for a tipper (one who shares "inside information") or a tippee (one who trades on that information) if that claim is plausibly alleged and pleaded with sufficient particularity.  To state a claim against a ***tipper***, as the Securities and Exchange Commission (SEC) attempts to do here, a complaint must plausibly allege that the tipper shared inside information with the contemporaneous understanding that the tippee would use that information for ***trading purposes***. As such, there is no actionable 10(b) claim against a husband telling his wife that he cannot pick up their son from soccer practice because he is working on a potential merger of Companies X and Y.  Similarly, a reckless disclosure by an insider speaking too loudly on the subway, without more, is not actionable against the insider under Section 10(b).  In these hypotheticals, the insiders knowingly or recklessly disclosed material, non-public information, but they are not liable under Section 10(b) or Rule 10b-5 because they did not make such disclosures with the contemporaneous understanding that the listener/tippee would subsequently trade on the information disclosed.

That is the case here.  The SEC's Complaint and its supposed basis for attempting to assign Section 10(b) liability to Mr. Carr boil down to a "How was your day?" email conversation between Mr. Carr and his significant other, Ms. Hanratty.  In that fleeting conversation—the kind that is commonplace in any intimate or familial relationship—Mr. Carr told Ms. Hanratty in passing about a business meeting he had earlier that day.  The SEC has not plausibly alleged, and cannot plausibly allege, that Mr. Carr's fleeting reference to that meeting was made with the contemporaneous understanding that Ms. Hanratty—who owned no securities and was totally unfamiliar with how to even purchase a stock—would later use the information for trading purposes.  To the contrary, the only plausible interpretation is that Mr. Carr shared this information with Ms. Hanratty for the sole purpose of telling her about his day, as she was telling him about

hers.  Beyond this clearly non-actionable conversation, the SEC fails to plausibly allege any other

tips or valid theories of liability.  As such, the SEC's insider trading allegations against Mr. Carr

are insufficient as a matter of law and should be dismissed.

## FACTUAL BACKGROUND

### The Merger of Heartland Payment Systems, Inc. and Global Payments, Inc.

Defendant Robert Carr founded Heartland Payment Systems, Inc. ("Heartland"), a

payment processing company based in New Jersey, in 1996.  Compl. ¶¶ 8–9.[1]  He served as CEO

of Heartland for approximately 20 years until 2016, when it was acquired by another payment

processing company, Georgia-based Global Payments, Inc. ("Global").  *Id.*  Discussions about this

acquisition began on or around October 15, 2015, when Global's CEO approached Mr. Carr at a

conference and requested an in-person meeting to discuss Global's potential acquisition of

Heartland.  *Id.* ¶ 12.  On November 9, 2015, Global's CEO and Mr. Carr met again in Atlanta,

Georgia, and continued their discussion about a potential strategic combination of their two

companies.  *Id.* ¶ 13.

On November 10, 2015, Heartland's board of directors authorized Mr. Carr to continue

discussions with Global's CEO.  *Id.* ¶ 15.  On November 11, Mr. Carr spoke with Global's CEO,

who followed up that call with an email, saying that he had spoken to Global's Chairman and that

he wanted to meet on Friday, November 20, 2015, to continue their discussions.  *Id.* ¶ 18.  Global

and Heartland continued to engage in preliminary discussions and necessary due diligence through

November.  *Id.* ¶¶ 28–29.  On November 21, 2015, Mr. Carr shared with his family (including Ms.

Hanratty) that Global had offered to buy Heartland, telling them that Heartland hoped to receive

---

[1] Although for purposes of this motion, we accept the SEC's well-pleaded allegations as true, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Heartland was actually founded in 1997, not 1996.

an offer of $100 per share. *Id.* ¶ 30. A few days later, on November 24, 2015, Global sent to Heartland a preliminary letter proposal offering $97.50 per share. *Id.* ¶ 32. Negotiations continued through December. *Id.* ¶ 33. News of the potential deal became public on December 10, 2015. *Id.* On December 15, 2015, Heartland and Global announced that they had finalized a merger agreement, whereby Global would acquire Heartland in a cash-and-stock transaction for $100 per share. *Id.* ¶ 36.

### Mr. Carr Sells and Gifts 115,000 Shares of Heartland Stock

After Mr. Carr's initial conversation with Global's CEO on October 15, and having already scheduled another in-person meeting with Global's CEO for November 9, Mr. Carr sold and gifted thousands of shares of his own Heartland stock on November 4, 2015. *See* Ex.[2] A (SEC Form 4, Nov. 6, 2015).[3] Specifically, Mr. Carr sold a total of 40,000 shares of his Heartland stock at a weighted average price of $72.80 per share, for a total of approximately $2.9 million. *See id.* He also gifted an additional 75,000 shares of his Heartland stock to charity. *See id.*

### Mr. Carr and Ms. Hanratty's Relationship

In approximately 2011, Mr. Carr entered into a romantic relationship with Katherine Hanratty, the co-owner of a Connecticut-based staffing agency. Compl. ¶ 7, 10. Like any couple, they were in frequent communication, traveled together for both business and pleasure, shared intimate aspects of their lives, and formed relationships with each other's families and friends. *Id.*

---

[2] All lettered "Ex." references herein are to exhibits to the Declaration of Michael G. McGovern in Support of Defendant Robert O. Carr's Motion to Dismiss the Complaint, filed herewith.

[3] Public documents required to be filed with the SEC, like the Form 4 here, are judicially noticeable under Federal Rule of Evidence 201(b)(2). *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Such judicially noticeable documents are appropriate for consideration in deciding a motion to dismiss. *See id.*; *see also In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003).

¶¶ 10–11.  As most significant others do, Mr. Carr "routinely confided [in] [Ms. Hanratty] regarding his work."  *Id.* ¶ 10.

As their relationship became closer, Ms. Hanratty, then 62 years of age, began to express to Mr. Carr concerns about her financial security.  *Id.* ¶ 11.  To ameliorate these concerns, in March 2015—seven months before Global initially approached Mr. Carr about a potential merger—Mr. Carr offered to give Ms. Hanratty $1 million dollars to ensure her financial security and provide her a "safety net."  *Id.* ¶ 11; Ex. B.[4]  Ms. Hanratty initially refused Mr. Carr's offer, but the couple continued to discuss his offer through at least the end of 2015, as she continued to express concerns about her financial security.  Compl. ¶ 11.

### *E-mail Exchanges on November 9 and 10, 2015*

On November 9, 2015, Ms. Hanratty and Mr. Carr exchanged a series of emails, as is typical for couples, about how their days were going:

- In the morning, Ms. Hanratty emailed Mr. Carr, saying "Have a good meeting with Global!"  *Id.* ¶ 13.

- At 4:32 p.m., Ms. Hanratty forwarded to Mr. Carr an email from a family friend about the friend's daughters' latest victories with field hockey and soccer, with a note saying, "If the [REDACTED] gals are around Thanksgiving weekend, I will take them to lunch.  If not

---

[4] The Court may properly consider this exhibit (a March 25, 2015 email from Ms. Hanratty to a friend) in deciding this Motion, as the SEC has incorporated this email by reference into the Complaint.  *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d at 356; *accord Coyne v. Gen. Elec. Co.*, No. 08-cv-1135 (SRU), 2010 WL 2836730, at *3 (D. Conn. July 15, 2010).  Documents may be incorporated by reference when "specifically referenced and discussed in . . . the Complaint."  *Catapano-Fox v. City of New York*, No. 14 Civ. 8036(KPF), 2015 WL 3630725, at *1 n.1 (S.D.N.Y. June 11, 2015).  The Complaint directly alleges that "Carr offered to give Hanratty some money for her financial security" in March 2015.  Compl. ¶ 11.  Having directly alleged the fact of Mr. Carr's March 2015 offer, the Complaint incorporates the supporting document by reference.

then maybe over the holidays.  They are such nice girls." Ex. C.[5]  On the next line, she said, "How was your meeting at Global?" *Id.*

- Mr. Carr responded at 6:47 p.m., writing "Just landed in Philadelphia.  Sweet girls, those [REDACTED].  Meeting was good.  Price is $97.50 and closing would be late December." *Id.*

- At 7:05 p.m., Ms. Hanratty responded, "Glad you are going home to your own bed but I wish I was with you.  Going to bed after I heat up some of that soup I made yesterday.  I love you more than soup xoxox."  She then added as a postscript, "Wow quite an offer." *Id.*

- Finally, moments later, Mr. Carr responded: "xoxo Off to [Board of Directors] dinner once I get to the house."  *Id.*

Mr. Carr's one statement concerning his meeting with Global—buried amidst romantic pleasantries and commonplace details of the couples' meals, bedtimes, and plans with friends, all shared with a significant other—is the *only* "tip" of material non-public information specifically alleged in the Complaint.

The Complaint alleges several other communications between Mr. Carr and Ms. Hanratty prior to November 18 (the day Ms. Hanratty placed her order to purchase Heartland stock, *see infra*), Compl. ¶¶ 17, 23, but *none* of these communications disclosed *any* information to Ms. Hanratty about Heartland's negotiations with Global or any other confidential information.  This includes the alleged communication on November 10, the day of a Heartland board meeting.  Ms. Hanratty emailed Mr. Carr hoping his board meeting had been "good," and Mr. Carr responded

---

[5] Again, because the SEC quotes directly from this email in its Complaint, Compl. ¶ 13, the Court may treat the email as incorporated by reference and rely upon it in deciding this motion.  *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d at 356; *accord Coyne*, 2010 WL 2836730, at *3.

that the meeting had been "good"; Ms. Hanratty replied that she was "[g]lad it went well." *Id.* ¶ 17.  This mundane exchange revealed nothing about the substance of the board meeting.

***Ms. Hanratty's Investment in Heartland***

As Mr. Carr had been offering to do since at least March 2015, on or about November 15, 2015, he used a portion of the proceeds from his November 4 sale of his Heartland stock to write a check to Ms. Hanratty in the amount of $1 million.  *Id.* ¶ 20.  When he gave her the check, he instructed her to invest in a certificate of deposit accounts ("CDs"), Ex. D,[6] and to put some amount of the proceeds in a savings account, Ex. E.[7]  Later on, Ms. Hanratty emailed herself the ticker symbol for Heartland—"HPY"—and conducted internet searches on "how to buy stock."  Compl. ¶ 21.

On November 17, Ms. Hanratty sent Mr. Carr an email, telling him that she intended to purchase Heartland stock when his check to her had cleared.  *Id.* ¶ 23; Ex. E.  She added that she was "following [his] advice to the letter" by keeping part of the money in a savings account. Compl. ¶ 23; Ex. E.  On November 18, after the check cleared, Ms. Hanratty directed her broker to purchase $900,000 in Heartland shares.  *Id.* ¶¶ 24–27.  The broker completed 75% of Ms. Hanratty's order on November 18, 22% on the next day (November 19), and the remaining 3% on November 23.  *Id.* ¶ 27.

---

[6] Submitted herewith as Exhibit D to the McGovern Declaration is an email from Ms. Hanratty to her accountant on November 15, 2015, wherein she wrote that Mr. Carr "suggested putting [the money] in CD's for now."  Although consideration of Exhibit D is not necessary at the motion to dismiss stage, should the case proceed, the evidence will show that this email represents precisely the advice that Mr. Carr gave to Ms. Hanratty.

[7] For the same reasons as stated in footnote 5, this Court may treat this email as incorporated by reference and rely upon it in deciding this motion.  *See supra* n.5.

***The SEC's 10(b) Claim***

The Complaint alleges a single violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5 thereunder against both Mr. Carr and Ms. Hanratty.  *Id.* ¶ 54.  It claims that "[t]he information described in the Complaint"—*i.e.*, concerning the potential acquisition by Global—"was material and nonpublic," and that Mr. Carr learned of that information in his role as Heartland's CEO.  *Id.* ¶¶ 49–50.  The Complaint then claims Mr. Carr "tipped Hanratty to trade in the stock of Heartland . . . in exchange for a direct or indirect personal benefit."  *Id.* ¶ 51.  Yet the only tip the Complaint identifies is Mr. Carr's passing remark to Ms. Hanratty over email on the evening of November 9.[8]  Finally, the Complaint claims that Mr. Carr knowingly or recklessly breached his fiduciary duty to Heartland by disclosing that confidential information to Ms. Hanratty, *id.* ¶ 47, but it fails to identify any specific personal benefit Mr. Carr received in exchange for that alleged breach, *id.* ¶ 51.  The SEC's claim for relief does not allege or refer to Mr. Carr's intent.

*          *          *

Solely at issue in this motion is the SEC's "tipper liability" claim against Mr. Carr.  The SEC has settled its claim against Ms. Hanratty on a neither "admit[] [n]or den[y]" basis, pursuant to which Ms. Hanratty has agreed to disgorge her trading profits and to pay a one-time penalty in the same amount.  *See* Consented Mot. Approval Settlement & Entry Final J. as to Katherine

---

[8] In one of the Complaint's "summary" paragraphs, it alleges that Mr. Carr "instructed [Ms. Hanratty] to use that money to open a brokerage account and purchase $900,000 worth of Heartland stock."  Compl. ¶ 2.  However, as discussed herein, the email the Complaint relies on for that "summary" allegation says that Mr. Carr instructed Ms. Hanratty to put some amount of the money in a "saving[s] account"; it says nothing about a brokerage account, and the Complaint does not otherwise specifically allege any instruction by Mr. Carr to Ms. Hanratty to purchase Heartland stock.  *See* Ex. E.

Hanratty 1, ECF No. 22.  The Court approved the Consent Judgment on October 4, 2018.  Final J.

as to Katherine M. Hanratty, ECF No. 23.

## ARGUMENT

**I.     APPLICABLE LAW**

### A.     "Insider Trading" Claims Must Be Plausible and Pleaded with Particularity

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  *Id.*  When evaluating a motion to dismiss, a court should "begin by identifying pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.*

at 679.  The court should then assume the truth of any remaining well-pleaded factual allegations

and determine whether they make it *plausible*, and not just possible, that a defendant acted

unlawfully: "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's

liability," the complaint has failed to plead plausibility sufficient to warrant relief.  *Id.* at 678

(quoting *Twombly*, 550 U.S. at 557).

Insider trading complaints are also subject to the heightened pleading standard of Rule

9(b), which requires a party to "state with particularity the circumstances constituting fraud."  Fed.

R. Civ. P. 9(b); *see SEC v. One or More Unknown Traders in Secs. of Onyx Pharms., Inc.*, 296

F.R.D. 241, 247 (S.D.N.Y. 2013).  Rule 9(b) requires that plaintiffs support allegations of fraud

with all the essential factual background: the "who, what, where, when, and how" of the alleged

fraud.  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 336 (D. Conn. 2004).  While

allegations about a defendant's state of mind may be pleaded "generally" under Rule 9(b), in

insider trading cases they "must be supported by specific facts that ***strongly support*** an inference

of fraudulent intent."  *Onyx*, 296 F.R.D. at 248 (emphasis added) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

### B.        Requirements to State a Claim for Tipper Liability under Section 10(b)

Section 10(b) of the Securities and Exchange Act and Rule 10b-5 prohibit fraud in connection with the purchase or sale of securities, including insider trading, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5—*i.e.*, when a corporate insider trades using material non-public information in breach of the duty of trust and confidence owed to the corporation's shareholders.  *See SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).  Although insider trading liability can extend to both *tippers* (those who share inside information) and *tippees* (those who trade on that information), *id.* at 285, the SEC often does not seek to assign tipper liability to an insider who does nothing more than share confidential information with his or her romantic partner.[9]

Only *tipper* liability is relevant here.  A tipper incurs liability for insider trading only if he "(1) tip[s] (2) material non-public information (3) in breach of a fiduciary duty of confidentiality owed to shareholders . . . (4) for personal benefit to the tipper."  *Id.* at 286.

The requisite state of mind for tipper liability is *scienter*, *id.* —"a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12

---

[9] *See, e.g.*, *SEC v. Rocklage*, 470 F.3d 1, 4 (1st Cir. 2006) (charging only downstream tipper, insider's wife, and tippees where "at the time that [the insider] originally conveyed th[e material nonpublic] information to [his wife], he had a reasonable expectation that she would keep it confidential and would not otherwise have disclosed the information"); *SEC v. Yun*, 327 F.3d 1263, 1270 n.16 (11th Cir. 2003) (charging only downstream tipper, insider's wife, and tippee where Commission described relationship between insider husband and tipping wife as one where he expected "she would not share the confidential information he gave her"); *United States v. Corbin*, 729 F. Supp. 2d 607, 610–11 (S.D.N.Y. 2010) (charging only downstream tipper, insider's husband, and tippees where insider and husband "had a history, pattern, and practice of sharing and maintaining confidences such that [her husband] knew and reasonably should have known that his wife expected that he would maintain the confidentiality of any material nonpublic information he obtained from her" (internal quotations omitted)).

(1976).  This is not mere negligence, but rather knowing or reckless conduct—"a defendant cannot be held liable for negligently tipping information."  *Obus*, 693 F.3d at 287; *see also Onyx*, 296 F.R.D. at 250.  Scienter for tipper liability is ascertained "***at the moment of tipping***," and "the unlawful actor must know or be reckless in not knowing that [his] conduct [is] deceptive."  *Obus*, 693 F.3d at 286 (emphasis added).  If a tipper "believed in good faith that the information disclosed to the tippee would not be used for trading purposes," the tipper is not liable under Rule 10b-5.  *Id.* at 287.

Whether a defendant acted with scienter "can often be deduced from the same facts that establish [whether] the tipper acted for personal benefit."  *Id.* at 286.  The test for personal benefit "is whether the insider personally will benefit, directly or indirectly, from his disclosure" of confidential information to the tippee.  *Dirks v. SEC*, 463 U.S. 646, 662 (1983).  The existence of personal benefit to the tipper "depends in large part on the ***purpose*** of the disclosure."  *Id.* (emphasis added); *cf. United States v. Falcone*, 257 F.3d 226, 230 (2d Cir. 2001) (Sotomayor, J.) (explaining that "the key factor" in proving personal benefit is "the tipper's intent in providing the information").  The tipper must "convey[] material nonpublic information to his 'tippee' with the understanding that it would be used for securities trading purposes."  *United States v. Gansman*, 657 F.3d 85, 92 (2d Cir. 2011).  As the Second Circuit recently clarified, "[t]he personal benefit requirement is designed to test the propriety of the tipper's ***purpose***."  *United States v. Martoma*, 894 F.3d 64, 74 (2d Cir. 2018) [hereinafter *Martoma II*] (emphasis added).  In *Martoma II*, the Second Circuit took great care to parse the impact of recent case law on the personal benefit requirement, stating explicitly that the tipper who does not, at the moment of tipping, expect his tippee to trade is protected from Rule 10b-5 liability.  *Id.* at 79.

10

## II.  THE SEC FAILS TO STATE A CLAIM AGAINST MR. CARR FOR TIPPER LIABILITY UNDER SECTION 10(B) AND RULE 10B-5

The SEC fails to state a claim against Mr. Carr for *tipper* liability.  *First*, the only alleged tip pleaded with any particularity is the information embedded in Mr. Carr's 6:47 p.m. email to Ms. Hanratty on November 9, but the Complaint lacks any allegation of scienter with regard to that disclosure.  This is fatal to the SEC's insider trading claim.  Nowhere does the Complaint allege that Mr. Carr shared this information with Ms. Hanratty *for trading purposes*.  This is not surprising, given that Mr. Carr's only plausible intent, at the moment of tipping, was to share with his romantic partner, at her invitation, various impromptu thoughts about friends, family and the events of his day—nothing more, and certainly with no contemporaneous understanding that she would subsequently trade on the information shared.

*Second*, the SEC has not plausibly alleged that any other tip occurred.  Rule 9(b) requires that the SEC plead insider trader claims with particularity, but the SEC has not done so here (nor can it): it fails to allege when any other tip occurred or what the substance of any such tip was. The most the SEC appears to allege is that Mr. Carr failed to tell Ms. Hanratty not to purchase Heartland stock after she advised him of her unilateral decision to do so, but this simply is not a basis of liability under Section 10(b).  As such, the SEC has not stated a claim against Mr. Carr for insider trading.

### A.  As to the November 9 Email Exchange, the Complaint Fails to Allege that, at the Moment of Tipping, Mr. Carr Had Reason to Expect that Ms. Hanratty Would Subsequently Trade on that Information

Again, the *only* "tip" pleaded with any particularity in the SEC's Complaint is the information embedded in the November 9 email exchange between Mr. Carr and Ms. Hanratty, where he told Ms. Hanratty—in passing and amidst daily minutiae and romantic pleasantries— that his meeting with Global had gone well and that Global's CEO had suggested a potential offer

price of $97.50 per share.  Compl. ¶¶ 13-14; Ex. C.  This off-hand remark cannot serve as the basis

of tipper liability under Section 10(b) and Rule 10b-5 for two reasons:  The Complaint does not

allege that Mr. Carr acted with scienter at the "moment of tipping," *Obus*, 693 F.3d at 286, nor

does it allege that Mr. Carr tipped this information to Ms. Hanratty with the contemporaneous

understanding that she would subsequently use it for trading purposes, *see Gansman*, 657 F.3d at

92.

　　　　The Complaint addresses the scienter requirement only in a conclusory, "[t]hreadbare

recital," *Iqbal*, 556 U.S. at 678, that "Carr tipped Hanratty . . . for a direct or indirect personal

benefit," Compl. ¶ 51.  Absent from this conclusory statement is any well-pleaded allegation that

Mr. Carr shared this information with Ms. Hanratty *for trading purposes* and that, as such, he stood

to benefit personally from the exchange.  The absence of any such allegation makes perfect sense,

given that the only plausible explanation for Mr. Carr's off-hand remark is that he and Ms. Hanratty

were simply sharing one of many details about each others' days in a run-of-the-mill conversation

between romantic partners.  *See SEC v. Switzer*, 590 F. Supp. 756, 766 (W.D. Okla. 1984) (holding

no 10b-5 liability for insider who "disclosed to his wife . . . that there was going to be a possible

liquidation of [his Company]," notwithstanding that such information was subsequently traded

upon).

　　　　By contrast, properly pleaded scienter and "personal benefit" elements of tipper liability

provide "specific facts that strongly support," *Onyx*, 296 F.R.D. at 248, the inference that, at the

moment of tipping, *Obus*, 693 F.3d at 286, the tipper "conveyed material nonpublic information

to his 'tippee' with the understanding that it would be used for securities trading purposes,"

*Gansman*, 657 F.3d at 92.  Again, the Complaint contains not a single allegation suggesting that

Mr. Carr shared the information about the Global meeting on November 9 "with the

understanding" that Ms. Hanratty would use it for trading purposes, *see id.*, let alone "specific facts" that would "strongly support" such an inference of intent—as required by Rule 9(b), *Onyx*, 296 F.R.D. at 248 (reciting scienter requirements under 9(b)).  *See also Salman v. United States*, 137 S. Ct. 420, 428 (2016) ("[B]y disclosing confidential information as a gift to his brother with the *expectation that he would trade on it*, Maher breached his duty of trust and confidence to Citigroup and its clients . . . ." (emphasis added)); *Obus*, 693 F.3d at 286-87 (discussing personal benefit requirement); *Martoma II*, 894 F.3d at 79 (noting that a tipper who does not "expect the tippee to trade" is "protected" from liability).

Indeed, the facts pleaded in the SEC's Complaint "strongly support" the opposite inference: that, at the moment of tipping, Mr. Carr had *no* reason to expect that his passing remark to Ms. Hanratty would later be used by her for trading purposes; therefore, there was no personal benefit to his "tip."  Rather, at 6:47 p.m. on November 9, after a long day of meetings and travel back to Philadelphia, Mr. Carr let his romantic partner know his plane had just landed and responded to her email about plans with family friends.  *See* Ex. C.  He then answered her question about the meeting with Global, telling her that it had been good and that Global's CEO had floated a potential price of $97.50 per share.  *See id.*  Nothing about this exchange "strongly supports" the inference that Mr. Carr shared this fact with Ms. Hanratty with the contemporaneous understanding or expectation that she would subsequently use that information to purchase Heartland stock.  After all, at that juncture, Ms. Hanratty "owned no securities" and had yet to "conduct[] internet searches on how to buy stock."  Compl. ¶¶ 21, 24; *Obus*, 693 F.3d at 287 (explaining that "personal benefit" requires that the "tipper knew [the tippee] could make use of material non-public information,"

such as with reckless disclosure to a day trader).[10]  These alleged facts strongly suggest that, at the moment of tipping, Mr. Carr did not expect Ms. Hanratty would trade on that information; as such, he could not plausibly have personally benefited from the exchange.

Nor is Mr. Carr and Ms. Hanratty's relationship, standing alone, sufficient, as a matter of law, to establish that Mr. Carr had the requisite scienter.  In *Martoma II*, the Second Circuit made clear that a personal relationship between tipper and tippee is not enough to infer personal benefit, without some understanding or expectation (at the moment of tipping) that the tippee would trade on the information disclosed.  894 F.3d at 79 ("[A] tipper who accidentally or unknowingly reveals inside information . . . would be protected . . . by the requirement that the tipper expect the tippee to trade." (citing *Gansman*, 657 F.3d at 92)).  The personal benefit standard, "although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature."  *United States v. Newman,* 773 F.3d 438, 452 (2d Cir. 2014).  If that were enough, then "practically anything would qualify," and "the personal benefit requirement would be a nullity."  *Id.*  Rather, the SEC must also allege that the relationship between insider tipper and tippee "suggests a *quid pro quo* from the latter, or an intention to benefit the [latter]."  *Id.* (quoting *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)); *see also Martoma II*, 894 F.3d at 68 (reaffirming same).  Neither is alleged here.

**B.**     **The SEC Fails to Allege Any Other Tips with Particularity, Much Less Plausibility**

The Complaint does not allege that Mr. Carr made any other disclosure of material non-public information to Ms. Hanratty.  Rather, the Complaint contains only the conclusory allegation

---

[10] *See also, e.g.*, *Martoma II*, 894 F.3d at 79 (assessing tipper/tippee liability in criminal context where tippee was an "investment manager who was seeking information on which to base securities trading decisions"); *Obus*, 693 F.3d at 289–92 (assessing tipper/tippee liability in civil context where tippee was hedge fund analyst).

that "Carr tipped Hanratty to trade in the stock of Heartland."[11]  Compl. ¶ 51.  This conclusory

allegation does not pass muster under Rule 8.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing

*Twombly*, 550 U.S. at 555)).  Nor does the Complaint allege the required "who, what, where, when,

how" of any such tip, as required by Rule 9(b)—*i.e.*, *what* Mr. Carr told Ms. Hanratty and *when*

he told her.  *See Onyx*, 296 F.R.D. at 248 ("[P]leading fraud with particularity requires the plaintiff

to specify the person who made the misrepresentation, the time and place of the misrepresentation,

the content of the misrepresentation, and the reasons the misrepresentation was fraudulent.").

The only plausible view of the SEC's allegations is that Ms. Hanratty made the decision to

purchase Heartland stock unilaterally and only subsequently sought Mr. Carr's guidance in that

regard.[12]  When—as he had been planning to do for months—Mr. Carr sold Heartland stock on

November 4 and then gave Ms. Hanratty the $1 million as a safety net, he instructed her, as

explained in the November 17 email, only to "keep[] [a certain] amount [] in a saving[s] account

for now."  Compl. ¶ 23.[13]  This email makes no mention of a brokerage account, as alleged in the

---

[11] As noted above, the Complaint contains a "summary" allegation in an introductory paragraph that Mr. Carr, on November 17, "instructed [Ms. Hanratty] to use that money to open a brokerage account and purchase $900,000 worth of Heartland stock," Compl. ¶ 2, but Ms. Hanratty's November 17 email from which this allegation apparently is derived simply cannot bear the weight the SEC seeks to place on it, *see* Ex. E.  *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (explaining that "unwarranted deductions of fact" are not admitted for purposes of a Rule 12(b)(6) motion).

[12] Indeed—as the SEC well knows—Ms. Hanratty has been unequivocal in her recollection that she made the decision to purchase Heartland stock unilaterally, that this was *against* Mr. Carr's initial advice, and that she only subsequently informed Mr. Carr of her unilateral decision.

[13] Although not referenced in the Complaint and, as such, not relied on for purposes of this motion, we note that, in a separate email to her accountant, *see* Ex. D, Ms. Hanratty explained specifically that Mr. Carr's instructions were to deposit the money "asap" and suggested "putting it in CD's for now."  Of course, advising Ms. Hanratty to put the money in CDs would have *precluded* her from immediately purchasing Heartland stock and was essentially the *opposite* of advising Ms. Hanratty to purchase Heartland stock.

Complaint.  *See id.* ¶ 2; Ex. D.  Moreover, the Complaint alleges that Ms. Hanratty "conducted internet searches on how to buy stock."  Compl. ¶ 21.  Had Mr. Carr instructed Ms. Hanratty to purchase Heartland stock, surely he would have explained to her *how* to buy that stock—*e.g.*, open a brokerage account—such that she would not have needed to consult the internet for guidance.

Even more, any conclusory allegation that Mr. Carr "instructed" Ms. Hanratty to purchase Heartland stock would be both illogical and implausible.  On November 4, 2015, after his initial conversation with Global's CEO and having already scheduled another in-person meeting with Global's CEO to discuss a potential acquisition, Mr. Carr *sold* and *gifted* 115,000 shares of Heartland stock worth over $8 million.  *See id.* ¶ 18; Ex. A.  Simple logic dictates that, if Mr. Carr was looking to capitalize on a potential merger with Global, he would not have sold and transferred over $8 million worth of stock on November 4; rather, he would have held onto his stock until such time as the pending discussions with Global either materialized into a merger or fizzled out.  Likewise, it makes ***no*** sense to suggest that Mr. Carr would *sell* stock, give the sale proceeds to Ms. Hanratty, and then *instruct* her to turn around and *buy back* that same stock.  And yet the SEC—which knows full well of Mr. Carr's November 4 sale—attempts to contort Ms. Hanratty's November 17 email to allege that Mr. Carr made such an irrational instruction.  This kind of through-the-looking-glass reasoning most certainly does not pass muster under *Twombly*'s plausibility standard.

As such, when the analysis of the SEC's Complaint is properly limited to its well-pleaded allegations, *Iqbal*, 556 U.S. at 678, the only "plausible" inference from those allegations is that Mr. Carr fulfilled his promise to give Ms. Hanratty $1 million to ease her concerns about financial security, Compl. ¶ 11; Ex. B; he gave her specific instructions to put the money into a savings account and/or CDs, where the funds would not be available for any stock purchase for several

months; and Ms. Hanratty—after conducting internet searches on "how to buy stock"—made a unilateral decision to purchase Heartland stock.

To be sure, Ms. Hanratty subsequently told Mr. Carr of her decision to purchase Heartland stock, and he did not advise her to refrain from doing so.[14] Compl. ¶ 23.  However, neither Section 10(b) nor Rule 10b-5 creates an affirmative duty to stop another from trading on material non-public information.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a); *Dirks*, 463 U.S. at 667.  As the Supreme Court held in *Santa Fe Industries, Inc. v. Green*, Rule 10b-5 does not bar all "breaches of fiduciary duty in connection with a securities transaction"; rather, the statute "speaks . . . specifically in terms of manipulation and deception," and "its history reflects no more expansive intent."  430 U.S. 462, 472–73 (1977).

## CONCLUSION

For all the foregoing reasons, Defendant Robert O. Carr respectfully requests that the Court dismiss the SEC's Complaint.

DEFENDANT ROBERT O. CARR,

By:  */s/ Michael G. McGovern*
Michael G. McGovern (# PHV09757)
*michael.mcgovern@ropesgray.com*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone: (212) 596-9000
*Admitted as Visiting Attorney*

---

[14] The fact that he did not give Ms. Hanratty such advice is not at all surprising.  Even had Mr. Carr recalled his passing reference to the Global meeting on November 9, he still would have had no reason to think that Ms. Hanratty was prohibited from purchasing Heartland stock.  If this case proceeds, evidence will show that on November 18, 2015—the *very same day* that Ms. Hanratty put in her order to purchase Heartland stock—the General Counsel of Heartland *authorized* Mr. Carr's transfer of Heartland stock, as well.

Colleen A. Conry (# PHV01151)
*colleen.conry@ropesgray.com*
Jeremiah Williams (# PHV09760)
*jeremiah.williams@ropesgray.com*
ROPES & GRAY LLP
2099 Pennsylvania Ave, N.W.
Washington D.C. 20006-6807
Phone: (202) 508-4600
*Admitted as Visiting Attorneys*


Alfred U. Pavlis (# CT08603)
*apavlis@fdh.com*
FINN DIXON & HERLING LLP
6 Landmark Square
Stamford, CT 06901-2704
Phone: (203) 325-5056
Fax: (203) 325-5001

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2018 a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system or by mail to anyone unable to accept electronic filing as indicated on the Notice of

Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael G. McGovern*
Michael G. McGovern